IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

_____

| | |
|---|---|
| RICHARD FRANKLIN BUCK, | Cause No. CV 11-141-M-DWM-JCL |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| WARDEN LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

_____

On October 19, 2011, Petitioner Richard Buck filed this action for writ of habeas corpus under 28 U.S.C. § 2254. Buck is a state prisoner proceeding pro se. On October 24, 2011, Respondent ("the State") was ordered to file documents from the state court record. It complied on November 18, 2011.

**I. Background**

Buck was charged in Montana's Twentieth Judicial District Court, Lake County, with three counts of felony assault with a weapon. At Buck's first trial in January 2008, while jury selection was going on in the courtroom, the State's

witnesses conversed in the hallway about many things, including the case, in flagrant violation of the trial court's no-contact order to all witnesses. Buck's counsel learned of the State's witnesses' misconduct immediately after jury selection. He moved for a mistrial. The trial court granted the motion, and trial concluded before any witness was sworn. Trial was reset for May 2008.

At the second trial, the jury convicted Buck on one of the felony counts and on the lesser included misdemeanor offense of simple assault on the other two counts. He was sentenced to serve a total of eleven years in prison, with five suspended.

Buck appealed, represented by the State Appellate Defender's Office. Counsel moved to withdraw and filed an *Anders* brief[1] addressing five issues. Buck's *pro se* response raised four issues: the trial court's denial of his motion to exclude the prosecution's chief witness, Deputy Sergeant Luc Mathias, or to require him to testify first; defense counsel's decision to withdraw his proposed jury instructions on disorderly conduct and to replace them with misdemeanor assault instructions; whether his right to an impartial jury was violated by the State's excusing Native Americans; and "whole case." Resp. to *Anders* Br. (doc. 7-10) at 1. The Montana Supreme Court "independently examined the record" and concluded that "an appeal

---

[1] *See Anders v. California*, 386 U.S. 738, 744 (1967), *codified at* Mont. Code Ann. § 46-8-103(2) (2007).

would be wholly frivolous." It granted counsel's motion to withdraw and dismissed the appeal. Order at 1 (doc. 7-11), *State v. Buck*, No. DA 08-0373 (Mont. Dec. 24, 2008).

Buck then filed a petition for writ of habeas corpus in the Montana Supreme Court. He contended that the declaration of mistrial violated his federal constitutional protection against double jeopardy; specifically, he asserted that the trial court should have barred retrial "due to the probability of collusion being detrimental to substantial justice." Pet. at 3 (doc. 7-13), *Buck v. Law*, No. OP 10-0490 (Mont. Oct. 5, 2010). After the State filed its response, the Montana Supreme Court denied and dismissed the habeas petition, at least in part because Buck requested the mistrial. Order at 2-3, *Buck*, No. OP 10-0490 (Mont. Dec. 14, 2010).

Buck filed his federal habeas petition on October 19, 2011.

## II. Analysis

Although Buck's claims may be time-barred and/or procedurally barred, it is more efficient to proceed to the merits. 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).

Buck contends that his federal right to due process was violated and a second

3

trial could not be fair because the conversation among three of the State's witnesses "tainted their credibility, and any testimony they might ever offer, forever." Pet. at 10. He also asserts a violation of his constitutional protection against double jeopardy. *See generally* Pet. (doc. 1) at 4-6, 10-11.

Buck's position is understandable. An order is an order. State's witnesses are not privileged to ignore it. But, after a careful review of the trial transcripts,[2] it is clear that Buck's federal constitutional rights were not violated.

**A. First Trial**

The first trial commenced on January 7, 2008. From about 8:50 a.m. to 12:30 p.m., defense investigator Tyrone Massey waited outside the courtroom with other witnesses while voir dire was conducted. 1 Trial Tr. at 120:1-10. Massey observed State's witnesses Mark Clary, Chris Atkinson, David Delaurenti,[3] and a fourth person he did not know as they talked about "families, . . . their occupations, . . . the fire department, . . . sporting events, outdoor activities, just . . . general conversation." *Id.* at 121:1-3. Because the trial court had issued an order pursuant to Mont. R. Evid. 615

---

[2] Buck did not request an evidentiary hearing in state court, standing instead on the facts shown in the transcript of the first trial. Because Buck did not seek to further develop the facts of his claim and also could not show by clear and convincing evidence that no reasonable factfinder could have found him guilty, the trial transcripts are the only evidence that can be considered. 28 U.S.C. § 2254(e)(2) and (A)(ii); *Williams v. Taylor*, 529 U.S. 420, 437 (2000).

[3] The court reporter for the first trial spelled this name "Delauranti." The trial court's docket spells the name "Delerante." The second court reporter's spelling, "Delaurenti," is used here.

4

prohibiting witnesses from speaking with one other,[4] 1 Trial Tr. at 117:18-24, Massey informed defense counsel, Noel Larrivee, of the State's witnesses' three-hour conversation. Larrivee duly advised the trial court.

Outside the presence of the jury, Delaurenti was called to the stand. Larrivee asked whether he agreed that, in a phone conversation the previous week, Larrivee specifically admonished him – "about three different times" – "that as a witness in this case that you weren't to speak to anybody . . . and I suggested that you bring a book so you wouldn't be put in a position where you wouldn't [sic] have to talk to anybody." Delaurenti said "Um-hmm" and "Right." *Id.* at 123:4-21.

Prosecutor Cory Allen then asked a few questions:

Q. All right. You just testified that during your conversation with Mr. Larrivee that you were instructed not to discuss the case –

A. Correct.

Q. – this incident with anyone else?

A. Correct.

Q. Have you done that?

A. Nope.

Q. Let me clarify the question. Have you discussed the facts of this

---

[4] Witnesses are sometimes instructed not to discuss the case or their testimony with other witnesses, as opposed to not conversing at all. But an order is an order.

case with –

A. Oh, before –

Q. – other witnesses?

A. Before I have with the other witnesses out there, yeah.

Q. Have you discussed the facts of the case with other witnesses since Mr. Larrivee told you not to discuss it with anyone?

A. Just the two guys that were out there, the other firemen. Just briefly, a little bit.

Q. Okay. What did you discuss?

A. Just basics, what maybe – just a little bit here and there. Nothing too extent [sic] I guess, you know.

Q. Um-hmm. Okay.

    Mr. Allen: Nothing further.

    The Court: Redirect?

    Mr. Larrivee: None, Your Honor.

    The Court: You may step down, sir. Anything further from either party?

    Mr. Allen: No, Your Honor.

    Mr. Larrivee: No more witnesses, Your Honor. I think the rule is clear.

    The Court: Motion for mistrial is granted. We are adjourned.

1 Trial Tr. at 124:6-125:13.

**B. Second Trial**

The second trial commenced on May 8, 2008. Deputy Sergeant Luc Mathias was designated as the State's representative. He was seated at counsel's table during jury selection for both trials. 1 Trial Tr. at 17:2-4; 2 Trial Tr. at 21:23-22:4. Therefore, he was not the fourth person absorbed in conversation outside the courtroom at the first trial. Nonetheless, Larrivee asked the trial court to require the State to call Mathias first, so that he would not be able to listen to the testimony and cross-examination of the other State's witnesses before he testified. The trial court denied the motion. 2 Trial Tr. at 9:13-12:16.

The following facts were undisputed at trial. The incident underlying Buck's convictions arose in the summer of 2007, a bad fire season in the forests of western Montana. The Jocko Lake fire and the Chippy Creek fire were both large and active on and around the Flathead Indian Reservation. In response, the Fire Management Division of the Confederated Salish and Kootenai Tribes imposed Stage 2 fire restrictions, prohibiting fireworks and all outdoor fires of any kind. Buck did not get the word. A neighbor passing his property around midnight on July 29 saw a "[g]ood-sized fire," "probably waist-high flames," at the head of the Buck family's driveway. He called 911.

Delaurenti, a member of the Ronan Fire Department, was dispatched to the scene. He arrived in his own pickup truck, which was equipped with flashing red lights on the dash. He explained to Buck that he was with the Fire Department and that Buck must put out his fire. Buck was "hostile" and "told [Delaurenti] to get off his property." Delaurenti backed out of the driveway and contacted the Sheriff's Office, which directed Sergeant Mathias to the scene.

About two minutes later, a one-ton pickup "basic standard fire truck" – with "decals, lights on top," "a water tank and hose reel and stuff like that" for dealing with brush fires – arrived and headed up Buck's driveway, followed shortly by Sergeant Mathias. Chris Atkinson and Mark Clary, in the fire truck, saw "[a] bonfire and a gentleman with a gun." The fire was shrinking, and the man had a small garden hose in his left hand while he held the rifle in his right, pointing up in the air. When he saw the gun, Atkinson began backing the fire truck out of the driveway. He stopped when he realized Mathias's vehicle was behind him. Mathias got out of his vehicle and walked up the passenger side of the fire truck. Clary told Mathias that Buck had a weapon. Mathias went to the front of the fire truck to take a look for himself. He saw Buck with the rifle pointed up in the air, told Buck to put it down, and reached for his own sidearm. Buck lowered the gun with the barrel pointed at Mathias, who was at the front of the truck. Mathias crossed to the driver's side of the vehicle for cover and

8

took aim at Buck.  In the same moment, Atkinson got out of the fire truck and took cover behind it, and Clary "look[ed] for the floorboard" in the passenger compartment of the fire truck.  Mathias and Buck faced each other for a few tense moments.  Mathias repeated several times his command to Buck to drop the weapon.  Buck leveled the rifle at Mathias at least one more time, then turned and went into his house.  Clary scrambled out of the fire truck and got behind it with Atkinson.  Buck emerged from the house without the rifle, and Mathias arrested him.

Buck's theory was that he was protecting himself against the incursions of people whom he did not know to have any business on his property.  The neighbor, Delaurenti, Atkinson, Clary, and Mathias were all the witnesses the State called.  Larrivee emphasized the following portion of Mathias's testimony, a recapitulation of a recorded and transcribed pretrial interview:

> [Q.]  So I asked this question, "Okay.  So you pulled your gun.  Are you holding it on him before he" – and then you answered what?
>
> A.  "Not at this time because as I was walk – as I walked up I pulled my gun out when I saw him with his gun."
>
> Q.  Okay.  And then go on.
>
> A.  "I stopped pulling it out and told him to put the gun down.  And as I start to – to aim at him, then he put his gun down."
>
> Q.  That's when he lowered the gun.
>
> A.  Yes.

9

> Q. Okay. And that actually happened twice.
>
> A. Yes.
>
> Q. And at no point did he ever point it right at Mr. Atkinson, did he.
>
> A. No. He wasn't pointing the gun.
>
> Q. Okay. And at no point did he point it right at Mr. Clary, did he.
>
> A. When I come in, no; he was pointed at me at that time.

2 Trial Tr. at 198:6-199:1.

In closing, Larrivee argued that Clary, for instance – who said Buck raised the rifle up to his shoulder, 2 Trial Tr. at 165:12-166:2, and that "[t]he defendant aimed the gun at the officer first," *id.* at 177:11-12 – embellished the facts. He urged the jury to accept Mathias's testimony and find Buck guilty, not of three counts of felony assault with a weapon, but of simple assault or negligent endangerment: "So what did Richard Buck do? He pointed a gun in the direction of someone who had a loaded gun pointed right at him. And so what should you do in this case? . . . [W]hat I want you to convict him of is either simple assault or negligent endangerment." *Id.* at 251:16-21. The jury agreed, in part, with Larrivee. It convicted Buck of felony assault with a weapon against Mathias but of simple assault against Atkinson and

Clary.[5]  *Id.* at 259:12-25.

   **C. Analysis**

      **1. Due Process and Fair Trial**

   Buck did not dispute the central fact that he leveled a rifle at Mathias. Felony assault with a weapon against Mathias was the only felony conviction Buck incurred. By Mathias's testimony alone, Buck committed at least negligent endangerment against Clary, and possibly Atkinson as well, yet he was convicted of simple assault, which has a lower maximum penalty than negligent endangerment. And Mathias was not involved in the illicit conversation at the first trial. On the facts, therefore, there simply is no claim to be made on Buck's behalf. Even if the witnesses in the hallway colluded, their collusion did not affect Mathias's testimony or the use Buck's counsel was able to make of it. Buck was not deprived of a fair trial or of any component of due process by the State's witnesses' flagrant violation of the trial court's order.

      **2. Double Jeopardy**

   Buck's double jeopardy argument also fails. The Double Jeopardy Clause of

---

[5] Felony assault with a weapon is committed when one person knowingly or purposely causes another "reasonable apprehension of serious bodily injury in another by use of a weapon or what reasonably appears to be a weapon." The maximum penalty is twenty years. Mont. Code Ann. § 45-5-213(1)(b), (2)(a) (2007). Misdemeanor assault is committed when one person purposely or knowingly causes reasonable apprehension of bodily injury in another. The maximum penalty is six months. *Id.* § -201(1)(d), (2). Negligent endangerment is committed when a person negligently engages in conduct that creates a substantial risk of death or serious bodily injury to another. The maximum penalty is one year. *Id.* § -208(1), (2).

11

the Fifth Amendment applies to the States. *Benton v. Maryland*, 395 U.S. 784, ___ (1969). Jeopardy "attaches" when the jury is sworn. That occurred at Buck's first trial before a mistrial was requested or declared, 1 Trial Tr. at 115:1-24, so a double jeopardy issue is fairly raised.

The Double Jeopardy Clause bars "repeated prosecutions for the same offense," *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982) (citing *United States v. Dinitz*, 424 U.S. 600, 606 (1976)), and confers on the defendant a right to have his trial completed by the first jury empaneled to try him, *id.* at 673; *see also Wade v. Hunter*, 336 U.S. 684, 689 (1949). It "does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Kennedy*, 456 U.S. at 473 (citing *United States v. Jorn*, 400 U.S. 470, 483-84 (1971) (plurality op.), and *Wade*, 336 U.S. at 689). Consequently, retrial is generally permitted where a mistrial is declared at a defendant's request. *Kennedy*, 456 U.S. at 670; *Jorn*, 400 U.S. at 485.[6]

But a second trial is barred when "bad-faith conduct by judge or prosecutor threatens the harassment of an accused by successive prosecutions or declaration of

---

[6] Retrial is also permitted where a defendant prevails on appeal, *see United States v. Ball*, 163 U.S. 662, 672 (1896); *Green v. United States*, 355 U.S. 184, 189 (1957), or in federal habeas proceedings, *see, e.g.*, *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005), or where a mistrial is granted out of "manifest necessity," such as a hung jury, *see United States v. Perez*, 22 U.S. (9 Wheat.) 579, 579-80 (1893). Retrial is not permitted where a conviction is reversed for lack of sufficient evidence. *Burks v. United States*, 437 U.S. 1, 18 (1978).

a mistrial so as to afford the prosecution a more favorable opportunity to convict." *Dinitz*, 424 U.S. at 611 (internal citations, quotation marks, and parentheses omitted). In *Oregon v. Kennedy*, the trial court found that a prosecutor did not intend to provoke a mistrial when he asked a witness whether he avoided doing business with the defendant "because [the defendant] is a crook." 456 U.S. at 669. As obviously inflammatory and improper as that question is, the United States Supreme Court still agreed with the trial court that it did not amount to intentional provocation of a defense motion for mistrial. 456 U.S. at 674. "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 676.

Like the prosecutor's question in *Kennedy*, the illicit conversation at Buck's first trial was plainly inappropriate. But, unlike Kennedy's case, the taint of the misconduct did not reach Buck's jury. Instead of moving for mistrial, counsel could have moved the trial court to hold the persons who violated the order in contempt, to sanction the prosecution for failing to impress upon its witnesses their duty to obey court orders, to advise the jury of the witnesses' misconduct, or to preclude those witnesses from testifying altogether. The trial court could have accepted or rejected any of those alternatives. And, if the illicit conversation prompted any of the

13

participants to change their testimony from their prior statements or reports, Buck had the same opportunity to point that out – even to ask the witnesses whether they discussed their testimony in violation of a court order – with or without the declaration of a mistrial. The situation simply does not support a finding that the prosecution intended to provoke Larrivee into moving for a mistrial. Neither the particular form of defense motion nor its granting was a sufficiently likely consequence of the witnesses' violation of the order. The facts do not support an inference of intentional, provocative, exploitive misconduct.

### D. Conclusion

In essence, Buck's petition asserts that the charges against him should have been dropped because the conversation among three of the State's witnesses "tainted their credibility, and any testimony they might ever offer, forever." Pet. at 10. Buck was entitled to present that theory to the jury. He did not, because he got what he wanted from the untainted testimony of Sergeant Mathias. Dismissal of criminal charges is not a typical remedy for prosecution witnesses' contempt of court. Certainly, the United States Constitution does not require it. Buck's petition should be denied on the merits.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it

enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Buck does not show a violation of any federal constitutional right. He is undeniably correct that the State's witnesses flagrantly violated the trial court's no-contact order by conversing in the hallway while jury selection was going on in the courtroom. But the facts of the situation do not support a finding that Buck was deprived of due process or a fair trial as a result. Buck himself relied on the testimony of the State's last witness, and that witness did not participate in the illicit conversation.

Nor does the character of the situation support a finding that the State's witnesses, or the prosecutor or the judge, intended to provoke a defense motion for mistrial. Trial could have proceeded, because the prosecution's misconduct did not taint the jury. Buck had the same opportunity with the first jury as with the second to show that the State's witnesses changed their testimony or even that they violated the

court's order. Defense counsel could have chosen other remedies, and the trial court could have taken other action. Neither a defense motion for mistrial nor the trial court's granting of it was so likely a consequence of the illicit conversation as to suggest deliberate provocation.

There is no substance in Buck's claim that the illicit conversation deprived him of a federal constitutional right. There is no reason to encourage further proceedings. A COA is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The Petition (doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Buck.

3. A certificate of appealability should be DENIED.

**NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT**

Pursuant to 28 U.S.C. § 636(b)(1), Buck may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If Buck files objections, he must itemize each factual finding to which objection is made and must identify the evidence

in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Buck from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

<u>Buck must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."</u> Failure to do so may result in dismissal of his case without notice to him.

DATED this 12th day of January, 2012.

    /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States District Court